UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SQUAXIN ISLAND TRIBE, ISLAND ENTERPRISES INC., SWINOMISH INDIAN TRIBAL COMMUNITY, and SWINOMISH DEVELOPMENT AUTHORITY,<br><br>Plaintiffs,<br><br>v.<br><br>FRED STEPHENS, Director, Washington State Department of Licensing,<br><br>Defendant. | No. C03-3951Z<br><br>ORDER |

The Squaxin Island Tribe and the Swinomish Indian Tribal Community (collectively, "Tribes") seek declaratory and injunctive relief barring the State of Washington ("State") from collecting taxes on fuel sold by the Tribes within their respective reservations.[1] The Tribes bring the following three claims: (1) the State is barred from collecting the fuel taxes for fuel sold on Tribal land because the legal incidence of the taxes fall on the Tribes without clear congressional authorization; (2) taxation by the State is preempted because the tribal and federal interests in the Tribes' activities outweigh the State's interest in taxing those activities; and (3) fuel taxation by the State unlawfully infringes on the Tribes' sovereignty and right to self-government. Second Am. Compl., docket no. 68. These claims are the

---

[1] The Tribes operate the stations through their economic development arms, Island Enterprises, Inc., and the Swinomish Development Authority.

ORDER 1−

subject of cross-motions for summary judgment. Docket nos. 101, 104, 108, and 115. Having reviewed the cross-motions for summary judgment, response briefs, and reply briefs, and having considered the oral argument of counsel as to all of the motions on October 27, 2005, the Court now enters the following Order.

## BACKGROUND

### Washington State Fuel Taxes

The present Washington State fuel tax system is based on a four-tiered distribution chain. At the top are "suppliers," which include refineries and those bringing fuel into Washington State by pipeline, cargo vessel, and ground transportation. The second tier is composed of "distributors," which are businesses that transport the fuel between suppliers and those making up the third tier in the chain, "retailers." Retailers are simply local stations that sell gasoline and diesel fuel. Finally, the fourth tier is composed of "consumers," which includes anyone who actually uses the fuel rather than reselling it. See Albright Decl., docket no. 102, at p. 7 (Beach Dep. at 15-17).

Prior to 1999, Washington State collected its fuel tax at the distributor level. See Former RCW 82.36.020 (1998). In 1998, the legislature made far-reaching amendments to the fuel tax collection system. See Former RCW 82.36 et seq. (1998); RCW 82.36 et seq. The State concedes that these changes were directed, in part, at avoiding the possibility that the legal incidence of the taxes would impermissibly fall on tribal retailers given the United States Supreme Court's opinion in Oklahoma Tax Commission v. Chickasaw Nation, 515 U.S. 450 (1995), discussed below. Washington State now uses a "tax-at-the-rack" system for collecting its fuel taxes, meaning the taxes are paid to the State when a supplier removes motor vehicle fuel from its refinery or terminal rack as the result of a sale to a distributor. Albright Decl., at 7 (Beach Dep. at 15-16); RCW 82.36.020(2). In turn, distributors are required by law to remit the fuel tax to the supplier. RCW 82.36.035(5)-(6). A supplier that does not receive the fuel tax from the distributor is entitled to a full refund from the State.

ORDER  2–

RCW 82.36.044. Consequently, suppliers bear little or no risk in the tax-at-the rack system; they simply collect and remit the funds and are reimbursed for any deficiency. Similar rules apply between distributors and retailers. Distributors are required to include fuel tax information on sales invoices sent to retailers, and retailers are required to maintain records of fuel taxes paid to distributors for two years. WAC 308-72-865(2); RCW 82.36.160. As with suppliers, a distributor may obtain a full refund for fuel taxes that cannot be collected from a retailer. RCW 82.36.373.

In contrast to those near the top of the distribution chain, the legal incidence of fuel taxation is less clearly defined between the retailer and consumer in Washington State. The Revised Code of Washington states that "[i]t is intended that the ultimate liability for the tax imposed under this chapter be upon the motor vehicle fuel user, regardless of the manner in which the collection of the tax is provided for in this chapter." RCW 82.36.407(1). This provision did not exist prior to 1999. Tax evasion of the motor vehicle tax by any person or corporation is a crime in Washington State. RCW 82.36.380(1)-(2) (tax evasion is a class C felony under RCW 9A.20). Despite the statement of intent and ostensible imposition of criminal liability for failure to pay the fuel tax, other aspects of the Washington State fuel taxation statutes indicate that little is done to ensure the tax is actually paid by the consumer. For example, retailers are not required by law to pass the fuel tax on to consumers, nor are they required to maintain records of having done so. Albright Decl. at 12, 16 (Beach Dep. at 36, 70). Additionally, there is no requirement that a fuel sales receipt indicate the amount of the tax, meaning consumers often have no way to know whether they have or have not paid the tax. Id. at 18 (Beach Dep. at 115). Consumers are not audited to determine whether the tax has been paid, and there is no street-level enforcement of the fuel tax applied to the average individual consumer. Id. at 12, 14 (Beach Dep. at 36-37, 56). Finally, unlike suppliers and distributors, retailers are not entitled to a refund if the tax is never collected

ORDER  3–

because a consumer fails to pay the tax or the fuel is never sold. Id. at 10 (Beach Dep. at 27-28), 32.

Washington State has entered into compacts with some of the tribes located within its border, providing that tribal members and tribal governments are not subject to the fuel tax. First Cade Decl., docket no 104, at Ex. 1 (Beach Dep. at 63-64). Where the fuel tax is included in the price paid at the retail level, the State remits funds directly to the tribal government for that tax. Id. The remittance generally occurs on a monthly basis and is based on a formula rather than actual amounts paid. Id. (Beach Decl. at 65). There is no requirement that a tribal government return the remitted funds to tribal members. Id. (Beach Decl. at 67). At oral argument, the parties agreed that the State has entered into such a compact with the Swinomish Tribe but has not done so with the Squaxin Island Tribe.[2]

The Squaxin Island Tribe's Fuel Station

Through its economic development arm, the Squaxin Island Tribe owns and operates a convenience store and retail fuel station known as the Kamilche Trading Post ("KTP"). Whitener Decl, docket no. 110, at 2. KTP shares an access road with, and is located near, the Little Creek Casino Resort on the Squaxin Island Tribe's land. Id. at 3. The Squaxin Island Tribe provides infrastructure and governmental services for KTP, including roads, sidewalks, lighting, parking lots, water and sewer systems, and electric infrastructure. Id. at 4. As of May 19, 2005, approximately 44% of the employees at KTP were tribal members. Id. at 6. For the purposes of this litigation, the Squaxin Island Tribe conducted a survey of KTP customers. The survey results indicated that 51% (± 1.4%) of KTP customers were

---

[2] Under the taxation compact, the State remits a percentage of the taxes collected by the Swinomish Tribe based on a predetermined formula that includes assumptions as to the number of tribal purchasers of fuel. Cade Decl., docket no. 104, Ex. 1 (Beach Dep. at 60-66). This litigation only relates to the balance of the State's taxes that go beyond the funds remitted to the Swinomish Tribe based on the formula in the compact.

ORDER  4–

Tribal members, residents of Tribal lands, and/or individuals visiting, working at, or making deliveries to Tribal businesses. Id. at 8-9.

### The Swinomish Tribe's Fuel Station

The Swinomish Indian Tribal Community owns and operates the Swinomish Northern Lights fuel station and convenience store ("SNL"). Olson Decl., docket no. 112, at 4. SNL shares an access road with, and is located near, the Swinomish Northern Lights Casino and Bingo Hall. Id. at 9. The Swinomish Tribe provides infrastructure and governmental services for SNL, including roads, bridges, parking areas and sidewalks, utilities services, as well as police and emergency services. Id. at 3-4. The survey results of SNL customers indicated that 72% ($\pm$ 4.3%) of SNL customers were either Tribal members, residents of Tribal lands, and/or individuals visiting, working at, or making deliveries to Tribal businesses. Id. at 8.

### The Tribes' Proposed Fuel Blending Activities

Both Tribes state an intent to construct on-reservation facilities capable of blending unadditized motor vehicle and diesel fuel with additive components. Whitener Decl. at 8-10; Olson Decl. at 19-21. Unadditized gasoline may not be lawfully sold under the Clean Air Act. 42 U.S.C. § 7545. The Tribes state that they will purchase the unadditized gasoline and diesel from suppliers off the reservations, transport the fuel to Tribal lands, blend it with the requisite additives, and sell the fuel at wholesale to their retail stations. Whitener Decl. at 8-10; Olson Decl. at 19-21. The cost of the additives is approximately $12 per gallon, with one gallon of additive sufficient to treat 8,800 gallons of unadditized gasoline (i.e., a cost of $.00137 per gallon sold). First Cade Decl., docket no. 115, Ex. 2 at p. 2. The Tribes' proposed fuel blending would require the design and construction of blending facilities, which the Tribes propose to pay for exclusively with Tribal and federal funds. Whitener Decl. at 8; Olson Decl. at 21-22. The Tribes claim that these fuel-blending plans will be

ORDER 5–

1  implemented "as soon as possible after the tax issue in this matter is resolved." Id.; Olson
2  Decl. at 19.

3        This case presents a classic conflict between state attempts to extend taxation onto
4  reservation lands and tribal efforts to exercise their inherent sovereignty to its fullest. Since
5  the early smoke-shop cases, courts have been required to determine when a state may tax
6  tribal activity on tribal land. See, e.g., Washington v. Confederated Tribes of Colville
7  Reservation, 447 U.S. 134 (1980). In 1995, the Supreme Court, in Chickasaw Nation,
8  clarified the federal legal incidence analysis. States such as Idaho and Washington
9  responded to Chickasaw Nation with legislative efforts to continue their taxation of tribal
10 fuel retailers. In Coeur d'Alene Tribe of Idaho v. Hammond, 384 F.3d 674 (9th Cir. 2004),
11 cert. denied, 125 S. Ct. 1397 (2005), the Ninth Circuit addressed Idaho's attempt to place the
12 legal incidence on distributors. The Hammond Court concluded that the incidence of
13 taxation was on retailers and held that Idaho could not enforce its tax on the retail sale of fuel
14 by the Coeur d' Alene Tribe on Tribal land. Id. at 688. Similarly, this Court now addresses
15 the question as to whether Washington State can enforce its fuel tax on the sale of fuel by the
16 Plaintiffs on Tribal land.

17 ## DISCUSSION

18       Summary judgment is appropriate where there is no genuine issue of material fact and
19 the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The
20 moving party bears the initial burden of demonstrating the absence of a genuine issue of
21 material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party
22 has met this burden, the opposing party must show that there is a genuine issue of fact for
23 trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The
24 opposing party must present significant and probative evidence to support its claim or
25 defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir.
26 1991). For purposes of these motions, reasonable doubts as to the existence of material facts

ORDER  6–

are resolved against the moving party and inferences are drawn in the light most favorable to the opposing party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The Tribes first claim alleges that the legal incidence of the State's fuel tax impermissibly falls on the Tribes without clear congressional authorization. The Tribes contend that the State's fuel taxation system, as written and applied, places the legal burden of the tax on retailers. The State contends that the Washington State legislature has clearly imposed the legal incidence of the fuel tax on the consumer or, alternatively, on the supplier. The parties agree that, if the legal incidence claim is resolved in the Tribes' favor, the Court need not reach either of the Tribes' additional claims.

Assuming it is necessary to reach the additional claims, the Tribes allege that the State's fuel taxes are preempted as to sales on Tribal land because the Tribal and federal interests outweigh the State's interest in imposing its tax. In support of their preemption claim, the Tribes rely on their proposed fuel-blending activity and a market-creation theory based on their use of casinos to draw customers to Tribal lands. The Tribes also allege that the State's fuel taxes infringe on their right to sovereignty because the taxes effectively preclude them from imposing an equivalent Tribal fuel tax. The State argues that there is no preemption because the Tribes' contribution to the value of the fuel under its blending proposal would be *de minimis* and that the market-creation theory is not a valid consideration. Further, the State contends that it has a strong interest in collecting the taxes for road construction and maintenance. The State argues that there is no infringement on Tribal sovereignty because there is no requirement that the Tribes' right to tax fuel sales be coextensive with the State's fuel tax.

I.      The Legal Incidence of Washington State's Fuel Tax

Unless Congress clearly provides otherwise, a State's tax is not enforceable if its legal incidence falls on a Tribe or its members for sales made within Indian country. Chickasaw

ORDER  7–

Nation, 515 U.S. at 453, 459. The Supreme Court has adopted a categorical approach to determine whether tribes or tribal members may be taxed:

> The initial and frequently dispositive question in Indian tax cases. . . is who bears the legal incidence of a tax. If the incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization. But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax.

Id. at 458-59 (citations omitted). In this case, the parties agree that there has been no "clear congressional authorization" to impose the fuel tax on the tribes or tribal members. The dispositive issue is, therefore, whether the legal incidence of Washington State's fuel taxes falls on retailers or some other person or entity in the distribution chain.

"The question of where the legal incidence of a tax lies is decided by federal law." Hammond, 384 F.3d 681 (citing Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 121 (1954)). The Ninth Circuit has succinctly described the legal incidence analysis as follows:

> [T]he United States Supreme Court has instructed that we are to conduct a fair interpretation of the taxing statute as written and applied. The person or entity bearing the legal incidence of the tax is not necessarily the one bearing the economic burden. Rather, to discern where the legal incidence lies, we ascertain the legal obligations imposed upon the concerned parties, and this inquiry does not extend to divining the legislature's true economic object. Further, a party does not bear the legal incidence of the tax if it is merely a transmittal agent for the state tax collector.

Id. (citations and quotations omitted).

In Chickasaw Nation, the case establishing the modern legal incidence analysis, the Supreme Court analyzed Oklahoma's fuel taxation scheme to determine whether the incidence fell on retailers or some other transactor, such as the wholesaler or consumer. 515 U.S. at 459. Oklahoma's fuel tax statutes did not expressly identify who bore the legal incidence of the taxes. Id. at 461. Given the "absence of such dispositive language," the Supreme Court was compelled to look to the Oklahoma statutes as written and applied. Id. In examining the statutes, the Chickasaw Nation Court found that the following aspects of Oklahoma's fuel taxation scheme placed the legal incidence on retailers: (1) the Oklahoma law required distributors to remit the fuel tax "on behalf of a licensed retailer," indicating

ORDER 8–

that distributors were merely transmittal agents; (2) distributors were allowed to deduct taxes that were uncollectible from retailers, but retailers could not deduct taxes uncollectible from consumers; (3) distributors were allowed to retain a small portion of the taxes as reimbursement for their collection services, but retailers were not; and (4) the Oklahoma law imposed no liability of any kind on a consumer for purchasing, possessing, or using untaxed fuel. Id. at 461-62. Because the Tribe in Chickasaw Nation was operating stations at the retail level on tribal land, and the legal incidence of Oklahoma's fuel tax fell on retailers, the Supreme Court held that the tax could not be enforced. Id.

In Hammond, the Ninth Circuit considered which link in the distribution chain bore the legal incidence of the fuel tax under Idaho's system. 384 F.3d at 679. Idaho had amended its fuel tax statutes after the Idaho Supreme Court ruled that the prior tax impermissibly fell on tribal retailers. Id. at 678-79; See also Goodman Oil Co. v. Idaho State Tax Comm'n, 136 Idaho 53, 28 P.3d 996 (2001). In amendments passed after the Chickasaw Nation decision in 1995, the Idaho legislature expressly provided that non-tribal distributors, rather than tribal retailers, were to bear the legal incidence of the tax. Id. at 679-80. After the amendments passed, the Coeur d'Alene Tribe of Idaho sued to enjoin Idaho from collecting the tax, arguing that the legal incidence continued to fall on the Tribe and its members under Chickasaw Nation. Id. at 680. Both the District Court and the Ninth Circuit concluded that retailers continued to bear the legal incidence of the fuel tax even after Idaho explicitly attempted to place the burden on distributors. Id. at 681. As a result, the Idaho fuel tax could not be enforced as to fuel sales by the Coeur d'Alene Tribe on tribal land.

The Hammond Court began by recognizing that Idaho's fuel tax statutes differed from those in the Chickasaw Nation case because the Idaho legislature expressly stated that distributors were to bear the legal incidence of the taxes. Id. at 680.[3] After undertaking a

---

[3] The Idaho Legislature had amended its fuel tax provision after Chickasaw and Goodman Oil with the clearly stated intent to place the legal incidence of the tax on distributors to

ORDER  9–

thorough analysis of whether Idaho's statement represented the "dispositive language" described in Chickasaw Nation, the Hammond Court concluded that the "legal incidence" determination could not be resolved by a state legislature's mere statement of intent. Id. at 682-83. The Hammond Court reasoned that allowing a legislature to tax tribes "by reciting *ipso facto* that the incidence of the tax was on another party would wholly undermine the Supreme Court's precedent that taxing Indians is impermissible absent clear *congressional* authorization." Id. at 683 (emphasis in original). Rather than rely on Idaho's statement of intent, the Hammond Court looked to the operative provisions of the fuel tax system just as the Supreme Court had done in Chickasaw Nation. Similar to Chickasaw Nation, the Hammond Court found the following factors dispositive in concluding that the incidence of the fuel tax fell on retailers in Idaho: (1) Idaho's law required distributors to pass the tax on to retailers; (2) distributors were entitled to tax credits for the cost of collecting and remitting the tax, suggesting that they were mere transmittal agents; (3) distributors were entitled to refunds for taxes they could not collect from retailers; and (4) retailers were not entitled to a refund for taxes they could not collect from consumers, even where the fuel was never sold. Id. at 685-88. Thus, despite the Idaho Legislature's declaration that the legal incidence of the tax was borne by distributors, the Hammond Court held that "the tax buck stops with the Indian tribal retailers," meaning the legal incidence impermissibly fell on those retailers and could not be collected. Id. at 687-88.

In this case, the Tribes contend that the factors articulated in Chickasaw Nation and Hammond are analogous and place the legal incidence on Tribal retailers. In contrast, the State's position on this issue is far from clear. Throughout its briefing, the State's primary position has been that the legal incidence is borne by motor vehicle fuel users[4] under the

---

allow collection of the fuel tax on Tribal reservations. Hammond, 384 F.3d at 680.

[4]The term "motor vehicle fuel user" and "consumer" are intended to have the same meaning for purposes of this Order.

ORDER  10–

Chickasaw Nation and Hammond factors. The State's briefing also suggested an alternative and conflicting argument, albeit not well developed, that the legal incidence is borne by suppliers because Washington State attempted to model its fuel taxation system on the system employed by the federal government, in which the legal incidence is placed on the supplier. Inexplicably, the State shifted its primary argument at oral argument, suggesting that suppliers bear the legal incidence under the Chickasaw Nation and Hammond factors.[5] Left unable to divine the State's true and final position, the Court will address each argument in turn.

### A. Motor Vehicle Fuel Users/Consumers

The Court first addresses the State's argument that the Chickasaw Nation and Hammond factors place the legal incidence on consumers rather than Tribal retailers.

#### 1. Intent of the Washington State Legislature

While there is no question that the Washington State Legislature intended to place the ultimate responsibility for payment of the fuel taxes on consumers, its statement of intent is not dispositive. RCW 82.36.020(1) states that the fuel tax is "hereby levied and imposed *upon motor vehicle fuel users*." (Emphasis added). Similarly, RCW 82.36.407(1) states that "[i]t is intended that the ultimate liability for the tax imposed under this chapter be upon the motor vehicle fuel user, regardless of the manner in which collection of the tax is provided for in this chapter." Notably, both of these legislative statements were added after, and in response to, Chickasaw Nation. Despite these unequivocal declarations, the Ninth Circuit has made it clear that "the legislative declaration is 'dispositive' as to what the legislature *intended*. . .[but] it cannot be viewed as entirely dispositive of the legal issue that the federal courts are charged with determining as to the incidence of the tax." Hammond, 384 F.3d at

---

[5]The State's suggestion that the incidence of the tax falls on the supplier is particularly surprising because the Washington State Legislature clearly indicated its intent to place the tax on "motor vehicle fuel users." See RCW 82.36.020(1) and RCW 82.36.407(1).

ORDER 11–

684 (emphasis in original). Thus, federal law requires courts to acknowledge a legislature's statement of intent as one factor among many in determining where the legal incidence of a tax falls, with additional consideration given to the operative effect of the tax statutes. Id. at 685. In Hammond, the Court ultimately disregarded the Idaho Legislature's attempt to place the incidence on distributors because the other factors were analogous to Chickasaw Nation. Id. at 688.

### 2. Legal Requirement that the Fuel Tax Move Downstream

Under the tax statutes at issue in both Chickasaw Nation and Hammond, distributors were required by law to collect the taxes from retailers and remit them to the State, but retailers were not legally required to collect the taxes from consumers. Also, the Hammond Court noted that "all invoices for sales by distributors to retailers must show that the state fuel tax was charged to the retailer." 384 F.3d at 686. Here, Washington State's tax system is similar to Idaho's in a number of respects. First, Washington Administrative Code § 308-72-865(2)(j) requires distributors to indicate whether or not the fuel tax has been paid on invoices sent to retailers.[6] Second, retailers in Washington State are required to maintain records of taxes paid for two years, which have been audited by the State in the past. RCW 82.36.160; Albright Decl. at 12 (Beach Dep. at 36). Finally, RCW 82.36.100 requires every person who acquires motor vehicle fuel to pay the fuel tax if the tax has not yet been paid. This requirement applies to both retailers and consumers, but the practical effect is that only retailers can be audited for compliance because consumers need not maintain records of taxes paid. As it operates, the statutory scheme requires that fuel taxes be passed from distributor to retailer but not from retailer to consumer. Just as in Hammond, this factor indicates that the "tax buck" stops at the retail level.[7]

---

[6] The Idaho Administrative Code required distributors to provide a statement that the Idaho fuel tax was included in the price of fuel sold to retailers. IAC 35.01.05.150(g).

[7] See also Sac and Fox Nation of Missouri v. Pierce, 213 F.3d 566, 580 (10th Cir. 2000)

ORDER  12–

### 3. Refunds for Uncollectible Taxes

The fuel tax statutes in both <u>Chickasaw Nation</u> and <u>Hammond</u> allowed distributors to obtain a refund for taxes that could not be collected from retailers. 515 U.S. at 461-62; 384 F.3d at 687. Conversely, there was no indication that the same rule applied to retailers (i.e., that retailers were entitled to a refund for taxes paid on worthless accounts receivable, stolen fuel, or fuel that could not be sold to consumers). As both courts viewed it, this factor suggested that those above the retail level in the distribution chain were mere transmittal agents. <u>Id.</u> The same reasoning applies here. While both suppliers and distributors in Washington State are entitled to full refunds for taxes that are uncollectible, retailers may not obtain similar refunds. <u>See</u> RCW 82.36.044 and 82.36.373 (refunds for suppliers and distributors). The State argues that this factor should carry little weight because retailers are unlikely to have accounts receivable for consumers and, therefore, such losses would only occur in cases of theft. State's Reply, docket no. 117, at 5-6. The State also contends that retailers can, and do, insure against such losses, making them irrelevant. These arguments are unpersuasive. To the extent the State's assertion about the lack of retail/consumer accounts receivable is even accurate (the State cites nothing to support the claim), the same was undoubtedly true in both <u>Chickasaw Nation</u> and <u>Hammond</u>—both of which used this factor to help identify retailers as those who bear the legal incidence of the tax. This factor weighs in favor of concluding that the legal incidence of the fuel tax falls on retailers in this case.

---

("Certainly, if the fuel tax law required distributors to include the amount of the fuel tax in their wholesale price, we would be justified in concluding that the legal incidence of the tax falls upon the Tribes."). In <u>Sac and Fox</u>, the Tenth Circuit concluded that the legal incidence fell on non-tribal distributors where distributors were not required to pass on the tax by law, but the "economic assumption" was that the value of the tax was passed on in the price. <u>Id.</u> at 579-80. Here, there may be an economic assumption that retailers will pass on the tax to consumers but, as in <u>Sac and Fox</u>, that assumption is not a controlling consideration.

ORDER 13–

4.   Reimbursement for Collection Services

Both the Oklahoma and Idaho fuel tax statutes allowed distributors to retain a small portion of the taxes they collected as reimbursement for the costs of such collections. The Supreme Court and Ninth Circuit concluded that this reimbursement allowance indicated that distributors had only a "collect and remit" function, which did not apply to retailers. Chickasaw Nation, 515 U.S. at 462; Hammond, 384 F.3d at 686. This, both courts reasoned, suggested that retailers were the last party in the supply chain to bear the true responsibility for fuel taxation. Id. Washington State makes no such allowance for suppliers, distributors, or retailers. If such an allowance existed for suppliers and distributors, but not for retailers, it would provide an additional reason to conclude that the legal incidence falls on retailers. However, the converse does not hold true; the unavailability of a reimbursement allowance for any party does not lead to the conclusion that the legal incidence falls on consumers. Rather, the Court concludes that this factor is neutral because no person or entity in the distribution chain receives any payment for collection services. Every party simply bears its own costs under the Washington State system.

5.   Liability of the Consumer

In Chickasaw Nation, the Supreme Court noted that Oklahoma's fuel tax imposed no liability of any kind on consumers for purchasing, possessing, or using untaxed fuel. 515 U.S. at 462. Hammond did not address consumer liability, presumably because Idaho took the position that it was distributors who bore the legal incidence under its fuel tax system. This case differs from Chickasaw Nation because Washington State has declared that motor vehicle fuel users are liable for fuel taxes and it potentially imposes criminal sanctions for tax evasion by any person or entity in the distribution chain. See RCW 82.36.020(1) (tax levied on "motor vehicle users"); RCW 83.36.407 (ultimate liability intended to be imposed upon motor vehicle fuel user); RCW 82.36.380 (evasion of taxes under Chapter 82.36 RCW unlawful). Despite these statutory provisions, it is not at all clear that the fuel user "liability"

ORDER  14–

is more than theoretical. First, there is no legal requirement that retailers pass the fuel tax on to the consumers. Second, as discussed above, retailers need not keep records of taxes paid by the consumers and consumers may or may not have the tax itemized on fuel receipts. Albright Decl. at 18 (Beach Dep. at 115-16). Finally, there are no enforcement efforts aimed at determining whether a motor vehicle fuel consumer in a passenger vehicle has paid the tax. Id. at 14 (Beach Dep. at 56). Thus, to the extent it exists, direct enforcement is very minimal and limited to commercial vehicles. Id. (Beach Dep. at 54-55). Because consumer liability lacks real consequences, it does not weigh heavily, if at all, in favor of concluding that consumers bear the legal incidence of fuel taxes.

  B. Suppliers

In its brief and at oral argument, the State offered alternative arguments suggesting that the supplier might bear the legal incidence of Washington State's fuel taxes. First, the State argues that Washington State's taxation is analogous to the federal law and, the State maintains, the federal law places the legal incidence on suppliers. Def.'s Mot., docket no. 104, at 15-16. Second, at oral argument, the State took the position that the legal incidence rests upon suppliers under the Chickasaw Nation and Hammond factors. The Court addresses each argument in turn and, for the reasons that follow, concludes that they are without merit.

  1. The Supplier as Analogous to the Federal System

The State argues that the legal incidence of the tax falls on suppliers if it does not fall on consumers. Although not clearly developed, the State's reasoning appears to be that the legal incidence of Washington State's tax falls on suppliers because the tax is modeled in part after the federal fuel tax system, for which (the State argues) courts have held that the legal incidence falls on suppliers. The State cites two cases in support. First, the State relies on Walsh Oil Company v. United States, 26 Cl. Ct. 426 (1992), which did not address a legal incidence issue. Rather, in Walsh, the plaintiff argued that there was no legal basis for its

ORDER 15–

payment of $178,000.00 in costs attributable to fuel taxes owed to a "producer" (i.e., a supplier) because it met the statutory requirements for an exemption. 26 Cl. Ct. at 427. The Claims Court rejected the argument, concluding that the plaintiff lacked standing. Id. In doing so, the Walsh court cited a 1975 Supreme Court case, Gurley v. Rhoden, 421 U.S. 200, 205 (1975), which held that the legal incidence of a federal excise tax on gasoline fell upon the statutory producer and not the purchaser of the gasoline. Gurley is the second case upon which the State relies. In Gurley, the Supreme Court held that the legal incidence fell on "producers" because: (1) they were the only parties legally required to pay the tax; and (2) Congress explicitly and exclusively placed the remittance burden on producers. 421 U.S. at 205-206.

Defendant's reliance on Walsh and Gurley is not helpful for several reasons. First, Walsh offers no analysis of the legal incidence question, which was not at issue in that case. Walsh merely cites Gurley's statement, made 20 years before the Supreme Court decided Chickasaw Nation. Second, although the analysis in Gurley is minimal, there are obvious differences between the federal statutes as they existed in 1975 and the present Washington State fuel tax system. The 1975 federal system placed the tax burden solely on producers and included no provisions regarding fuel tax activity lower down the distribution chain. In its analysis, Defendant does nothing to describe how Washington State's system could possibly place the legal incidence on suppliers under the factors articulated in Chickasaw Nation and Hammond. Nor does the Defendant make any attempt to deal with the differences between the 1975 and 1988 federal fuel tax systems. In short, Walsh and Gurley do not stand for the propositions upon which the State relies in arguing that the current Washington State system is analogous to the federal system.

        2.        <u>The Supplier Under the *Chickasaw Nation* and *Hammond* Factors</u>

The State's alternative argument that suppliers bear the legal incidence of the fuel taxes under the modern analysis is directly contradicted by Hammond. In Hammond, Idaho

ORDER 16–

took the position, both in its legislation and the litigation, that the distributors bore the legal incidence of the tax. The distributors in <u>Hammond</u> are analogous to the suppliers in this case—both are legally required to pass the tax down the distribution chain and remit the tax to the states. RCW 82.36.020; Idaho Code § 63-2435. Also, both are entitled to refunds when they cannot collect the taxes. RCW 82.36.044; Idaho Code § 63-2407(6). Conversely, retailers in both Idaho and Washington State do not face the same legal requirement and are not entitled to refunds. <u>See</u> RCW 82.36.044 and RCW 82.36.373 (refunds for suppliers and distributors only); <u>Hammond</u>, 384 F.3d at 687-88. The only <u>Hammond</u> factor not applicable to this case is Idaho's provision that distributors may retain a small portion of the taxes as reimbursement for their collection responsibilities. However, as discussed above, this factor is neutral in Washington State because no person or entity in the distribution chain is entitled to such reimbursement. Accordingly, there is no basis to conclude that suppliers bear the legal incidence of the fuel taxes in Washington State under <u>Hammond</u>.

### C. Legal Incidence Conclusion

The question of which party bears the legal incidence of a tax is decided by federal law and based on the state tax statutes as written and applied. <u>Hammond</u>, 384 F.3d at 681. Although consumers in Washington State will nearly always find the tax imbedded in the price of fuel, the Supreme Court explicitly cautioned against using "economic reality" as a basis for answering the legal incidence question. <u>Chickasaw Nation</u>, 515 U.S. at 459-60. Instead, courts must take a categorical approach based on the legal requirements of the particular taxation scheme. <u>Id.</u> at 460. While the factors here are not identical to <u>Chickasaw Nation</u> or <u>Hammond</u>, they are very similar. Washington State's fuel tax statutes effectively require suppliers and distributors to pass the fuel tax down the distribution chain without imposing the same requirement on retailers. Likewise, suppliers and distributors are entitled to refunds for uncollectible taxes while retailers are not. Finally, consumer "liability" for payment of the fuel taxes is virtually non-existent. Simply put, the tax buck stops at the

retail level of the distribution chain.  Absent clear congressional authorization, which does not exist in this case, it is impermissible to levy the fuel taxes on the Tribes for the sale of fuel products on Tribal lands.  The Court GRANTS the Tribes' motion for summary judgment and concludes as a matter of law that their retail fuel stations bear the legal incidence of the Washington State fuel taxes and DENIES the State's cross-motion.[8]

## CONCLUSION

The Court concludes that the legal incidence of Washington State's fuel taxes falls on retailers and not on the motor vehicle fuel user under Chickasaw Nation and Hammond.  As a result, the Court GRANTS the Tribes' motion for partial summary judgment, docket no. 101, and DENIES the State's motion for partial summary judgment, docket no. 104, and hereby ENJOINS the State from further collection of its fuel taxes as to the Tribes' retail sales of fuel products on Tribal land.  Further, the Court STRIKES AS MOOT the cross-motions for partial summary judgment as to preemption and infringement on tribal sovereignty, docket nos. 108 and 115, as those claims need not be considered where the legal

---

[8] Because the State is categorically barred from imposing its fuel tax on the sale of fuel on Tribal lands, the Court does not reach either the preemption or infringement on tribal sovereignty claims.  Although those claims require no analysis, the Court notes that the hypothetical nature of the Tribes' fuel blending proposal raises a serious ripeness concern as to the preemption issue.  The ripeness doctrine prevents premature adjudication and is aimed at cases that do not yet have a concrete impact upon the parties.  See Thomas v. Union Carbide Ag. Prod. Co., 473 U.S. 568, 580 (1985).  Further, the "case or controversy" requirement also shields federal courts from being drawn into disputes concerning abstract or hypothetical cases, as federal courts have no power to render advisory opinions as to what the law ought to be or affecting a dispute that has not yet arisen.  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240 (1937).  Here, the Tribes' declarations state that their fuel blending operations are contingent.  See Whitener Decl. at 8; Olson Decl. at 19.  Thus, it is highly questionable whether the Court could consider the blending proposal in any event.  The Court also notes that the Tribes' market creation theory of value is solely based on and analogous, if not identical, to the Tenth Circuit decision in Prairie Band Potawatomi Nation v. Richards, 379 F.3d 979 (10th Cir. 2004).  The Supreme Court accepted certiorari of Prairie Band and heard oral argument in that case on October 3, 2005.  125 S. Ct. 1397 (2005).  The Tenth Circuit decision is of questionable precedence at this time.

ORDER  18–

1  incidence of the fuel tax falls on the Tribes.  Finally, the Court STRIKES AS MOOT the
2  Tribes' motion to strike, docket no. 119.
3        The Tribes are directed to file a proposed judgment and permanent injunction
4  consistent with this Order by December 9, 2005.  The State may file any written objections
5  to the proposed judgment by December 16, 2005.

7        IT IS SO ORDERED.
8        DATED this 22nd day of November, 2005.

                                                  /s/ Thomas S. Zilly
                                        Thomas S. Zilly
                                        United States District Judge

ORDER   19–